Filed 4/28/23 P. v. Cory CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RONALD L. CORY,<br><br>Defendant and Appellant. | B315668<br><br>(Los Angeles County<br>Super. Ct. No. KA030961-04) |

APPEAL from an order of the Superior Court of Los Angeles County, Rob B. Villeza, Judge.  Affirmed.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

In 1997, a jury convicted Ronald L. Cory of, among other crimes, two counts of felony murder with true findings on two special circumstance allegations. Years later, Cory petitioned for vacation of his murder convictions and resentencing under Penal Code[1] section 1172.6, which limited accomplice liability for murder.[2] After an evidentiary hearing under that section, the trial court denied the petition, concluding that Cory was a major participant in the underlying felony who acted with reckless indifference to human life and, as such, ineligible for relief. Cory now appeals the order denying his petition, and we affirm.

## BACKGROUND

I.     The evidence from Cory's trial[3]

This case arises from a February 8, 1996 home invasion robbery that resulted in the deaths of Curtis Reilly and Charles Johnson. Cory was jointly tried with Kevin Watkins and Joseph Portillo for murder and related crimes. Isaac Pereira was also implicated in the crimes but was not tried with Cory, Watkins, and Portillo.

---

[1]     All further undesignated statutory references are to the Penal Code.

[2]     Effective June 30, 2022, section 1170.95 was renumbered to section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.)

[3]     We have granted the People's request for judicial notice of the record from Cory's direct appeal (*People v. Ronald Lee Cory and Joseph John Portillo* (June 8, 1999, B118065) [nonpub. opn.]).

2

A.     *Events leading to the murders*

The victim Reilly was acquainted with some of the defendants through his friend, Patricia Russell. Reilly sold drugs and sometimes Russell would arrange for Portillo and Pereira to buy drugs from him. On February 5, 1996, three days before the murders, Russell was introduced to Cory when she went with him, Portillo, and Pereira to buy speed from Reilly at his auto body shop.

The next day, February 6, 1996, Portillo, Pereira, and Cory were at Russell's home. Portillo and Pereira asked Russell what Reilly had at his house, what he collected, if he had guns, and who lived with him. According to Russell, Cory was quiet during these conversations. Russell told them that two men, Johnson and Keith Palmer, lived with Reilly and that Palmer, whom she described as a little crazy, was always home. She also told them that Reilly had guns, although she was lying, because she had never seen guns at Reilly's house.[4] She lied because she wanted them to be afraid to go to Reilly's house.

On February 7, 1996, Russell, Pereira, Portillo, and Cory again went to Reilly's auto body shop, although only Russell went inside. Pereira gave Russell $10 to buy methamphetamine, which she thought was odd because she couldn't buy enough methamphetamine to get all of them high with that amount. That afternoon, Cory shot up methamphetamine at Russell's home.

The morning of the murders, February 8, 1996, Reilly was at Russell's home when Portillo and Pereira came over. Portillo argued with Reilly about Reilly's supposed interest in Portillo's

---

[4]     There was other evidence that Reilly did keep a gun in the house.

former girlfriend, Anna Scott. Pereira and Reilly also argued about a glass pipe Pereira was refusing to return. Later that day, at about 7:00 p.m., Portillo asked Russell if she knew where to get a gun, and she told him her brother might know. Portillo called Russell at about 10:30 p.m. and again asked questions about Reilly's house, what he collected, and who was there.

Scott, Portillo's ex-girlfriend, testified that their relationship had ended in the months preceding Reilly's murder. Scott was also friends with Reilly. In January 1996, Portillo asked Scott a couple of times what kind of security devices and weapons Reilly had at his house. Portillo said he wanted the stuff. About a week before the murders, Portillo told Scott he was going to do something, he might not make it out alive, and somebody might die. On the evening of the murders, Portillo asked Scott if she had a gun or if she knew how he could get one. He said he had a shotgun but needed more.

B.    *The night of the murders*

The night of the murders, at about 10:30 p.m., six people were at Reilly's house: the three men who lived there (Reilly, Johnson, and Palmer), and three others (Donnie Aiken, Debbie Olmer, and Sharon McCart). Olmer sometimes stayed at Reilly's house. Aiken was Reilly's friend and had come by to fix Reilly's computer. McCart had dropped by to discuss with Palmer a problem she was having with her car. Aiken and McCart testified about what happened next.

According to Aiken, there was a knock on the door at about 11:00 p.m. It was Pereira, who said he was there to apologize to Reilly for something that had happened earlier. Reilly let him in. There was a second knock on the door, and Pereira opened the door and said some of his friends were there. Cory, Portillo, and

4

Watkins came inside. Watkins had a locking blade knife in his hand. Cory opened up his coat and brought up a shotgun. At trial, Aiken demonstrated how Cory held the shotgun and had his "right finger extended as if to be on the trigger."

Reilly called to Johnson, saying " 'They got a gun.' " Aiken, who had been a sharpshooter in the army, "dove" for the shotgun, reasoning that he could survive a knife attack but that if Cory started shooting, nobody would make it out. He and Cory struggled over the shotgun, and Portillo joined the struggle, hitting Aiken. Aiken did not see Portillo with a weapon. Meanwhile, Aiken could see Johnson fighting with Watkins. Reilly had grabbed a pool stick and was swinging out with it.

At some point, Aiken felt a punch to his back, causing him to let go of the shotgun. Because Cory and Portillo were in front of him, he reasoned that whoever hit him was behind him. Aiken realized he was bleeding from a stab wound, and he saw Pereira, smiling and wiping blood from a six-inch fixed-blade knife on his pants leg. Aiken also saw Reilly, face down on the ground. Aiken did not see who stabbed him or Reilly. Cory went through the kitchen, in the direction Johnson had gone. Aiken tried to crawl away but, at Pereira's direction, Portillo got on top of Aiken. Aiken could hear Pereira yelling at Reilly, "Where is the shit?" Pereira asked Portillo where the other people were, and Portillo said they had left already.[5] Portillo got off Aiken and left with Pereira.

McCart testified that she was in another room when she heard a commotion. A man McCart didn't recognize told her and

---

[5] At the preliminary hearing, Aiken testified that Cory and Watkins left before the others.

Olmer to go into the bathroom. Olmer fled outside, through a window. McCart heard someone say, "Get the girl," so she locked the door. The same man who had ushered her into the bathroom broke down the door, and when McCart said she was the only one there, the man walked back into the family room.[6] McCart heard the same voice angrily ask, " 'Where is the shit?' "

Reilly died at the scene from a stab wound that penetrated his heart. Johnson had been stabbed twice but he did not immediately die and was transported to a hospital. Johnson was able to communicate to officers that he did not know who stabbed him before he died.

Watkins was arrested that night with a knife in his pocket and blood on his hands. His car was found parked near Reilly's house with a loaded shotgun in it. While Watkins was being held in jail, a cellmate overheard Watkins brag that he went to a residence to retrieve drug money, a fight broke out, and he joined in stabbing someone. Watkins said he " 'went off on the guy.' "

Cory was not arrested until August 1996, when a patrol officer stopped the car he was the passenger in. The officer noticed that Cory was extremely nervous and had puncture marks on his arm, suggesting drug use. The officer had Cory exit the car and place his hands on his head. Cory admitted he had a loaded gun in his waistband and ammunition clips. The officer retrieved the gun, which was loaded, and methamphetamine. Cory asked the officer if he could let him go, and when the officer refused, Cory said he (Cory) was never going to see the light of day again once the officer found out who he was. Recognizing

---

[6] McCart identified Pereira as the man who ushered them into the bathroom and then broke down the door.

6

Cory from a wanted poster, the officer asked Cory if he was referring to a murder.  Cory said he got in a fight with some people, and there were pool sticks involved and everyone was fighting.  He said he was at Reilly's house but did not kill anyone.  Cory also told the officer that his cautious approach to the car when he stopped them kept the situation from becoming ugly.

C.    *Cory's testimony*

Cory testified in his defense.  Around the time of these events, Cory was unhoused and living on the streets or going from house to house, including Watkins's house.  He was also addicted to and sold crystal methamphetamine, and when the murders occurred, he was using methamphetamine every day.  As of February 1996, Cory had known Watkins for about two months and Portillo for four months.  He had met Pereira four or five times.

Cory had $1,000 and wanted to buy an ounce of methamphetamine with it.  Watkins said he could buy it from Reilly, so that night, Watkins drove Cory to Reilly's house.  Cory never spoke to Portillo or Pereira about going to Reilly's home that day.  He was not present during any discussion about whether Reilly had guns and who lived with him.

When Cory and Watkins arrived at Reilly's house, Cory noticed Pereira's car but didn't think much about it.  Cory and Watkins walked to the door, and Watkins knocked on it.  Cory did not have a weapon, had not seen a shotgun in Watkins's car, did not see Watkins with a knife, and was not intending to cause any trouble.  A man answered the door, and Cory and Watkins went inside. Almost immediately, Cory was hit with something; his head cracked open, and blood squirted down his face, blinding him in one eye.  He saw stars and his vision went blurry.  He

7

thought he was hit twice. Cory could tell there was a scuffle happening around him, but the next thing he remembered was Watkins helping him leave the house. Cory estimated he was in the house just 30 to 40 seconds before leaving. Cory blacked out for a bit, but Watkins led him to the street, they separated, and some strangers gave Cory a ride to a friend's house. Cory no longer had the $1,000, and he had no idea who took it from him. The next day, Cory learned that people had died. He was too scared to turn himself in.

## II. Verdict and sentence

A jury convicted Cory of two counts of first degree murder of Reilly and Johnson (§ 187, subd. (a)), attempted premeditated murder of Aiken (§§ 664, 187, subd. (a)), attempted robbery (§§ 664, 211), attempted first degree residential burglary (§ 459), and first degree residential burglary (§ 459). The jury found true principal (§ 12022, subd. (a)(1)) and personal (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a)(1)) gun use allegations as to all counts. Also, the jury found true two special circumstance allegations: multiple murder and the murders were committed during the commission of an attempted robbery. (§ 190.2, subd. (a)(3) & (17).)

In 1997, the trial court sentenced Cory to life in prison without the possibility of parole for the murders, life for the attempted murder, and 10 years for the burglary.

On direct appeal, a different panel of this Division affirmed Cory's judgment of conviction, rejecting, among others, appellants' argument that there was insufficient evidence to support the felony-murder special circumstance findings. (*People v. Cory*, *supra*, B118065.) However, the matter was remanded for resentencing. On remand, the trial court resentenced Cory to life

8

without the possibility of parole for the murders, life plus 10 years for the attempted murder, and 16 years for the burglary.

III.   Section 1172.6 petition and evidentiary hearing

After our Legislature passed Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) to limit accomplice liability for murder, Cory petitioned to vacate his murder conviction and for resentencing.  The trial court appointed counsel, received briefing, and set the matter for an evidentiary hearing.  At the evidentiary hearing, the trial court admitted the abstract of judgment, charging documents, jury instructions, Court of Appeal decisions, and reporter and clerk transcripts from Cory's trial.

Cory also testified at the hearing.  He said that when the crimes occurred, he was addicted to methamphetamine.  Indeed, he was still using methamphetamine during the trial, at which he did not testify truthfully.

On February 7, 1996, Cory spent the night at Watkins's house, and as of February 8, he had been up for a week without sleep because he was using methamphetamine multiple times a day.  On the evening of the murders, Cory told Watkins he wanted to buy a sixteenth of methamphetamine, and Watkins said he had something in the works.  At about 10:30 p.m., Cory went to Reilly's house to buy methamphetamine, but he denied knowing of any plan to rob people.  Cory had $100, not $1,000 as he had testified at trial.  He and Watkins drove alone to the house, but they did not discuss any plan to rob people.

But when they got to the house, Watkins reached under his seat, pulled out a shotgun, and told Cory to put it under his coat.  Watkins said the shotgun wasn't loaded and that they were going to steal drugs.  Cory didn't want to take the gun, but Watkins

9

was aggressive, so Cory put the shotgun under his coat. Cory did not see Watkins with any weapons.

As they approached the house, Cory saw Portillo standing outside and Pereira driving up. Cory did not see Portillo with any weapons. Portillo knocked on the door, and Cory entered the house after him. At Watkins's instruction, Cory pushed his coat aside to show the shotgun and raised the barrel to his waist, but he did not put his finger on the trigger. Someone yelled that there was a gun, and within seconds, Cory was struck on his head twice, causing him to bleed and to almost lose consciousness. Fighting broke out, and Watkins helped him from the house. Because Watkins had dropped his car keys in the house, he and Cory walked down the street, but Watkins eventually left Cory on his own. Although they left with the shotgun, Cory did not remember what happened to it. He didn't turn himself in because he was afraid and still high on drugs.

After Cory testified, the trial court heard argument from both counsel. The People argued that Cory was still guilty of murder under three theories: (1) as a direct aider and abettor with the shared intent to kill, (2) as a major participant in the felony who acted with reckless indifference to human life, or (3) under an implied malice theory.

The trial court spoke at length in ruling on the petition. It first noted that Cory's testimony at the evidentiary hearing differed from his trial testimony, and so it found Cory not credible and his testimony deserving of little weight. The trial court then said it did not believe that Cory thought he was taking an unloaded shotgun into the house and that the occupants would just turn over the drugs when he showed the shotgun to them.

10

The trial court found that the People met their burden of proving beyond a reasonable doubt that Cory was a major participant in the felony and acted with reckless indifference to human life. The trial court explained that Cory was a major participant because he went on several drug buys with his cohorts on February 6, 7, and 8 to determine the right time to rob Reilly. Cory was present when Portillo and Pereira talked to Russell about whether Reilly had guns in the house and who lived there. Cory entered the house with a loaded shotgun, which elevated the risk of death and danger and caused the occupants to react and defend themselves. "And by pulling up the shotgun with a finger on the trigger, Mr. Cory signaled he was prepared to kill during the robbery."

As to the reckless indifference prong, the trial court found that Cory knew that carrying a loaded shotgun and pulling it up with his finger on the trigger would "ignite the confrontation and likely lead to death." He was armed, he knew that at least one of his cohorts had a knife, and he knew that Reilly had guns in the house. "[R]using the house occupants and pulling out a loaded gun for a violent and criminal purpose is an egregious and inherently dangerous act." As he was in the room with his cohorts, he had the opportunity to restrain them. As to the event's duration, it was "extended well beyond a typical grab-and-go" robbery. It was unclear to the trial court what Cory knew of his confederates' propensity for violence, but he knew they were trying to find out if they would face multiple armed residents at a stash house, and a cohort was trying to find more guns to use. Cory made no effort to minimize the risk of violence and instead elevated it by pulling up a shotgun with his finger on the trigger. And after lethal force was used, Cory simply left the house.

11

The trial court also found that Cory shared intent to kill, based on his use of a loaded shotgun and his finger on the trigger.

The trial court therefore denied Cory's petition.

## DISCUSSION

I.     Senate Bill 1437 and standard of review

Senate Bill 1437, which took effect on January 1, 2019, limited accomplice liability under the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates to murder, to the end of ensuring that a person's sentence is commensurate with the person's individual criminal culpability.[7] (*People v. Gentile* (2020) 10 Cal.5th 830, 842–843.) As relevant here, Senate Bill 1437 amended the felony-murder rule by adding section 189, subdivision (e), which provides that a participant in the perpetration of qualifying felonies is liable for felony murder only if the person: (1) was the actual killer; (2) was not the actual killer but, with the intent to kill, acted as a direct aider and abettor; or (3) the person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in section 190.2, subdivision (d). (*Gentile*, at p. 842.)

Senate Bill 1437 also added section 1172.6, which created a procedure whereby persons convicted of murder under a now-invalid theory of murder may petition for vacation of their convictions and resentencing. A defendant is eligible for relief under section 1172.6 if the defendant meets three conditions: the

---

[7]     Senate Bill No. 775 expanded relief to convictions for attempted murder and manslaughter, but Cory makes no argument regarding his attempted murder conviction.

12

defendant (1) must have been charged with murder under a theory of felony murder, (2) must have been convicted of first or second degree murder, and (3) could no longer be convicted of first or second degree murder due to changes to sections 188 and 189 effectuated by Senate Bill 1437. (§ 1172.6, subd. (a).) If a petitioner makes a prima facie showing of entitlement to relief, the trial court shall issue an order to show cause (§ 1172.6, subd. (c)) and hold an evidentiary hearing at which the prosecution bears the burden of proving "beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder" under the law as amended by Senate Bill 1437 (§ 1172.6, subd. (d)(3)). The parties may offer new or additional evidence at the evidentiary hearing. (*Ibid.*) A "finding that there is substantial evidence to support a conviction for murder" is insufficient to meet this required showing. (*Ibid.*) The trial court sits as an independent factfinder to determine beyond a reasonable doubt whether the defendant is guilty of murder under a valid theory of murder. (*People v. Garrison* (2021) 73 Cal.App.5th 735, 745.)

On appeal, we review the trial court's findings for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298 (*Clements*); accord, *People v. Mitchell* (2022) 81 Cal.App.5th 575, 591.) Under that standard of review we " ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' " (*Clements*, at p. 298.) It is the trial court's job to evaluate and resolve contradictions in the evidence to make credibility determinations.

(*Ibid.*)  It is our job on appeal to determine whether there is substantial evidence, contradicted or not, to support a rational fact finder's conclusions beyond a reasonable doubt.  (*Ibid.*)  We presume in support of the judgment the existence of every fact that can be reasonably deduced from the evidence.  (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.)

II.    The trial court did not misapprehend what evidence it could consider or the standard of review

Cory first argues that reversal is required because the trial court improperly relied on the Court of Appeal opinion affirming his judgment of conviction on direct appeal.  We disagree.

At a section 1172.6 evidentiary hearing, admission of evidence is governed by the Evidence Code, "except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion."  (§ 1172.6, subd. (d)(3); see also *People v. Lewis* (2021) 11 Cal.5th 952 [appellate opinion has limited probative value in assessing whether prima facie case for relief has been made].)  Thus, trial courts should not rely on factual summaries in prior appellate opinions when a section 1172.6 petition reaches a full-fledged evidentiary hearing. (*Clements*, *supra*, 75 Cal.App.5th at p. 292.)

To support his argument that the trial court here relied on the factual summary in the appellate opinion, Cory cites the minute order from the evidentiary hearing, the parties' briefing stating the facts as derived from the appellate opinion, and a comment the trial court made at the evidentiary hearing.  The trial court's minute order, however, merely stated it admitted the

14

appellate opinion as an exhibit. It did not state that the trial court relied on the factual summary in reaching its decision. As for the parties' briefing, it has little bearing on what *the trial court* read and considered in denying the petition. And while the trial court noted that the Court of Appeal had inferred Cory's intent to kill Reilly and Johnson from the jury's finding of guilt on the attempted murder count, the trial court went on to explain why it believed Cory acted with intent to kill, citing his use of a loaded shotgun with his finger on the trigger.

In any event, the trial court said multiple times that it had reviewed the entire record from Cory's criminal trial. At a hearing to discuss procedural matters, the trial court said it had the trial transcripts on a CD but preferred to review a hard copy the People had attached as an exhibit, further commenting that it wanted to review the record in preparation for the evidentiary hearing. Then, at the outset of the evidentiary hearing, the trial court made a record of what it had reviewed, including the trial transcripts and the Court of Appeal decision affirming the judgment of conviction. Moreover, the trial court said it had "very carefully" read Cory's trial testimony—something that its pointed questions at the hearing, its observations about how Cory's hearing testimony differed from his trial testimony, and its detailed ruling confirms. The record thus shows that the trial court did not improperly just read and rely on the appellate opinion to inform itself of the facts. It scrupulously read the trial transcript. The suggestion that the trial court read the entire trial transcript but disregarded it to rely on the Court of Appeal's factual summary is therefore meritless. (See, e.g., *Clements*, *supra*, 75 Cal.App.5th at p. 293 ["As far as we can discern, the

15

trial judge admitted the prior appellate opinion, but did not rely on it."].)

For these reasons, we reject Cory's related contention that his counsel below rendered ineffective assistance by adopting the prosecutor's statement of facts which in turn relied on the appellate opinion. Indeed, we fail to see how this can be, given that Cory's counsel presented new evidence, namely, Cory's testimony, at the evidentiary hearing and therefore clearly was not relying on any other party's summary of facts or the one in the appellate opinion. (See generally *Strickland v. Washington* (1984) 466 U.S. 668 [ineffective assistance of counsel claim requires error and prejudice].)

Cory raises a second argument in his reply brief, that the trial court misapprehended its role as an independent factfinder that was required to decide whether the prosecution proved beyond a reasonable doubt Cory's guilt of murder under a valid theory, and instead used a sufficiency of the evidence standard. We do not, however, consider arguments raised for the first time in a reply brief because it is unfair to the respondent, who has no opportunity to respond. (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 894–895, fn. 10; *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.) In any event, the argument is meritless. The trial court acknowledged that "the People have the burden to prove beyond a reasonable doubt that the record of conviction supports the murder conviction." The trial court then found that the People "met that burden as the evidence proves beyond a reasonable doubt that the defendant was a major participant in the underlying felony and acted with reckless indifference to human

16

life." Nothing in the record shows that the trial court relied on the wrong standard of proof.

III. Sufficiency of the evidence Cory was a major participant in the felony who acted with reckless indifference to human life

Cory contends that the trial court erred by denying his section 1172.6 petition because there was insufficient evidence to support its conclusion that he was a major participant in the felony who acted with reckless indifference to human life. After setting forth our California Supreme Court's articulation of the factors relevant to determining who is a major participant who acts with reckless indifference to human life, we explain why sufficient evidence supports the trial court's finding that Cory met that definition.

A. *What it means to be a major participant who acts with reckless indifference to human life*

This area of law regarding what it means to be a major participant in a crime who acts with reckless indifference to human life has its genesis in two United States Supreme Court cases: *Enmund v. Florida* (1982) 458 U.S. 782 and *Tison v. Arizona* (1987) 481 U.S. 137. *Enmund* held that the death penalty could not constitutionally be imposed on an armed robbery getaway driver who was a minor participant in the crime, was not present when the murder was committed, and had no intent to kill. (*Enmund*, at pp. 798, 801.)

In contrast, *Tison v. Arizona, supra*, 481 U.S. at page 139, did not preclude imposing the death penalty for two defendants, brothers, who had helped their father and his cellmate—both convicted murderers—escape from prison. The defendants gave

17

them guns, and the group later kidnapped a family of four. The defendants then stood by while their father debated whether to kill the family and proceeded to shoot the family, including a toddler and a teenager. (*Id.* at pp. 139–141.) The court held that the Eighth Amendment does not prohibit imposing the death penalty on a nonkiller who lacked the intent to kill, but whose "participation [in the crime] is major and whose mental state is one of reckless indifference to the value of human life." (*Id.* at p. 152; see also *id.* at pp. 157–158.)

Years later, in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), our Supreme Court addressed *Enmund* and *Tison* and substantially clarified the "major participant" and "reckless indifference to human life" requirements. *Banks*, at page 794, considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant." The court listed various factors that should be considered in making that determination: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.)

The court then turned its attention to "reckless indifference to human life" in *Clark*. Reckless indifference to human life is " 'implicit in knowingly engaging in criminal activities known to

carry a grave risk of death.' " (*Clark, supra,* 63 Cal.4th at p. 616.) It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.) Recklessness has both a subjective and an objective component. (*Ibid.*) Subjectively, the defendant must consciously disregard risks known to him. Objectively, recklessness is determined by "what 'a law-abiding person would observe in the actor's situation,' " that is, whether defendant's conduct " 'involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.' " (*Ibid.*)

*Clark* listed factors to consider when determining whether reckless indifference existed: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*In re Scoggins* (2020) 9 Cal.5th 667, 677 [summarizing *Clark* factors].)

B.    *Major participant*

Cory's contention that he was not a major participant rests on his reweighing of the evidence and resolution of inferences and credibility determinations in his favor. However, as we have said, the trial court found Cory not credible, and the standard of review does not allow us to find otherwise. (See generally

19

*Clements, supra,* 75 Cal.App.5th at p. 298.) The standard of review also does not allow us to resolve contradictions in the evidence in Cory's favor, where the trial court resolved them against him. Thus, Cory's observation that many facts were "contested" is of little moment.

Turning to the *Banks* factors, the evidence suggests that Portillo took the lead in planning the robbery. Nonetheless, as the trial court found, there was also evidence Cory was present during at least one discussion between Portillo, Pereira, and Russell about whether Reilly had guns in the house and who lived with him. Although Russell said that Cory was quiet during that conversation, he would have nonetheless been aware of what they were planning. Further, Cory went with Portillo and Pereira to buy drugs from Reilly at his auto shop in the days immediately preceding the murders. Although there was no evidence about what was said during these trips, a reasonable inference is they were information-gathering forays because, for example, Russell said that Portillo gave her just $10 to buy methamphetamine, but she couldn't buy enough methamphetamine with that amount to get four people high. And although Cory cites his own testimony that he had no idea Pereira and Portillo would be at Reilly's house, the trial court did not believe that testimony. The evidence shows that Cory participated in planning the robbery, so this supports the trial court's finding he was a major participant.

Cory's relationship to the weapons also supports that finding. Although the evidence shows that Portillo procured the shotgun, it was Cory who used it. It is hard to use a gun during a crime and not be considered a major participant. Further, at least Watkins and Pereira had knives. Although Cory denied

20

knowing that Watkins had a knife, the trial court did not believe Cory. Indeed, Watkins and Cory drove to Reilly's house together and Watkins walked into the house with the knife out. The trial court therefore had reason to disregard Cory's attempt to distance himself from the weapons.

As for what Cory knew of any particular dangers posed by the proposed crime, weapons used, and his confederates, the evidence is not as clear. Cory had not known Watkins, Portillo, and Pereira for long, and there is no evidence they had any propensity for violence that Cory knew about. But Cory was present when Russell said Reilly kept guns at his house, which should have signaled that the situation could be volatile.

Based on these *Banks* factors, there was sufficient evidence to support the trial court's finding that Cory was a major participant.

C.    *Reckless indifference to human life*

Cognizant that the *Banks/Clark* factors overlap, we reexamine Cory's use of the shotgun and knowledge that weapons would be used in the context of how it shows reckless indifference to human life. The trial court disbelieved Cory's story that he didn't know about the shotgun until just before entering Reilly's house, when Watkins supposedly made him take it. There was reason to disbelieve this story: Cory was present when Portillo asked Russell whether Reilly had guns in his house, and Cory drove with Watkins to the house, raising an inference he would have seen the shotgun in the car. Although Cory's mere knowledge that he and Watkins were armed is insufficient by itself to establish reckless indifference to human life (see, e.g., *Clark*, *supra*, 63 Cal.4th at p. 617), Cory *actively* used his gun to threaten the victims. Cory entered the house with the gun

21

hidden under his coat but, once inside, moved his coat aside to show the shotgun, raised it, and moved his finger to the trigger. As the trial court said, "And by pulling up the shotgun with a finger on the trigger, Mr. Cory signaled he was prepared to kill during the robbery." Such use of his gun enabled the murder and exhibited reckless indifference to human life. (See, e.g., *People v. Bradley* (2021) 65 Cal.App.5th 1022, 1033 [wielding gun during robbery reflects reckless indifference to human life]; *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1089.) Similar to here, the *Bascomb* defendant used his gun to threaten and keep victims at bay during a bank robbery, thereby actively enabling the murder. The *Bascomb* defendant did not discharge his gun and yet was found to have exhibited reckless indifference to human life by merely displaying it threateningly.

As for Cory's presence at the crime scene, he was struggling with Aiken over control of the shotgun when Aiken was stabbed. Cory could have been in a position to see the stabber—the evidence suggests Pereira—approach Aiken with a knife and have time to warn Aiken or try to stop the stabber. (See, e.g., *In re Loza* (2017) 10 Cal.App.5th 38, 51, 53 [petitioner had time to observe and react before murder because he heard killer threaten to shoot clerk and count to five before doing so].) However, there was evidence that these events transpired quickly, which could suggest Cory had little time to control his accomplices' actions, especially with respect to the stabbings of Reilly and Johnson. (See, e.g., *In re Scoggins, supra*, 9 Cal.5th at p. 679 [quickness of shooting suggested defendant lacked control over accomplices' actions]; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 989 [defendant lacked meaningful opportunity to intervene when he and shooter were on opposite sides of victim's car, and attempted

carjacking was quickly executed]; *In re Moore* (2021) 68 Cal.App.5th 434, 452 [defendant not " 'close enough' " to restrain shooter].)  However, the evidence also shows that Cory and Watkins left while Portillo and Pereira were still in the house; yet, Cory did nothing to try and get them to leave or to otherwise restrain them.  While Cory might argue he was in no physical position to do so because he had been hit on the head, the trial court was entitled not to agree.  Even a brief opportunity is still an opportunity to intervene to prevent violence.  (*In re McDowell* (2022) 55 Cal.App.5th 999, 1012 [defendant was knocked to the ground but still had brief opportunity to say or do something to restrain accomplice].)

There is no evidence Cory did anything to minimize the risk of violence.  Instead, the evidence is he heightened the risk of violence.  He and his accomplices scoped out Reilly by going to his auto shop.  They also chose to rob a drug dealer's house when they knew he and others would be home, given the time of night (11:00 p.m.) and that Russell had told them multiple people lived there and that at least Palmer was always home.  (See, e.g., *People v. Owens*, *supra*, 78 Cal.App.5th at p. 1024 [bank robbery posed high risk of violence because it occurred during business hours with 20 people present and robbers were armed].)  Had they wanted to minimize the risk of violence, they could have robbed the house when Reilly was at his auto body shop.  Also, the plan had Pereira going into the house first under the ruse he was there to apologize to Reilly.  Pereira then let his armed accomplices in, giving them the element of surprise and ambush.  Cory and his accomplices entered the house armed, likely anticipating armed resistance and prepared to meet it.  Such a decision to arm oneself, viewed in combination with the

23

particularly risky crime involved—a home invasion robbery of a methamphetamine dealer known to have guns in his home—shows this was not a garden-variety robbery. (See, e.g., *In re McDowell, supra,* 55 Cal.App.5th at p. 1011; *People v. Mora* (1995) 39 Cal.App.4th 607, 611 [defendant who entered drug dealer's house to rob him had to know of risk of resistance to armed home invasion and extreme likelihood death could result].) The potential for such a robbery to turn violent is "obvious." (*McDowell*, at p. 1011.) The occupants' reactions to the shotgun underscores that Cory's use of it heightened the risk of violence. Aiken immediately reasoned that he had to grab for the shotgun because he knew he and the others wouldn't survive a gun attack, and Reilly called out to Johnson for help by yelling that there was a gun. Cory's use of the shotgun thus prompted a violent response. Instead of preventing resistance and the risk of death, the evidence supports a finding that Cory's conduct contributed to Reilly's and Johnson's deaths.

As for what Cory knew about any propensity for violence Watkins, Portillo, and Pereira might have had, there is little evidence on this factor, except perhaps some knowledge that Portillo and Pereira were angry with Reilly and seeking revenge. The trial court thus said it was unclear what Cory knew about his confederates' propensity for violence, although the trial court also noted that they were trying to find out if they would face multiple armed residents at a stash house, and Portillo was trying to find more guns to use. Thus, while this evidence may not speak to what Cory knew about any *propensity* for violence his accomplices had, he knew they were anticipating and *preparing for* violence.

24

Next, sufficient evidence supports the trial court's finding that the crime was of some duration and longer than a "grab and go" operation. Generally, there is a greater opportunity for violence when victims are held at gunpoint or restrained for prolonged periods. (*Clark*, *supra*, 63 Cal.4th at p. 620.) Here, Pereira went inside the house first to draw out Reilly by pretending he was there to apologize. Pereira then let in Watkins, Cory, and Portillo, at which point they began fighting with the occupants of the house. Relying on his own testimony that he was in the house only 30 or 40 seconds before someone hit him, Cory argues that the crime was of short duration. The trial court did not credit Cory's testimony but, in any event, this is not the accurate measure of the crime's duration. Rather, the crime began when Pereira entered the house and lasted until at least all the robbers left.

And while Cory points out that there was evidence he left while the crime was ongoing, this does not necessarily negate his reckless indifference. Rather, if he left while Portillo and Pereira were still fighting with Reilly and Johnson, this confirms he did nothing to restrain his accomplices. At a minimum, he failed to give aid to at least Aiken, who was stabbed before Cory left the house. Such failure to aid victims shows reckless indifference to human life. (See, e.g., *Clark*, *supra*, 63 Cal.4th at p. 619; *In re Parrish* (2020) 58 Cal.App.5th 539, 544 [reckless indifference shown by failure to pause to aid or comfort victim]; *People v. Douglas* (2020) 56 Cal.App.5th 1, 10 [petitioner "displayed no interest in moderating violence or in aiding his bloody and suffering victim," and instead picked his pocket].)

The totality of the *Clark* factors, and in particular Cory's use of the shotgun and acts that heightened the risk of violence,

supports the trial court's finding that Cory acted with reckless indifference to human life.  Because we therefore conclude that there was sufficient evidence to support the trial court's finding that Cory was a major participant in the felony who acted with reckless indifference to human life, we need not address whether the evidence also supported the trial court's finding that Cory had the intent to kill Johnson and Reilly.

## DISPOSITION

The order denying Ronald Cory's Penal Code section 1172.6 petition is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

I concur:

LAVIN, J.

EGERTON, J.

26